## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Holly Lynn Berry,

        Plaintiff,

v.

Commissioner of
Social Security,

        Defendant.

_____

Case No. 21-12524
District Judge Mark A. Goldsmith
Magistrate Judge Jonathan J.C. Grey

## REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Holly Lynn Berry seeks judicial review of the Commissioner of Social Security's ("Commissioner") final decision denying Berry's application for disability insurance benefits under the Social Security Act. On February 7, 2022, Berry filed a motion for summary judgment (ECF No. 10), and on April 1, 2022, the Commissioner filed a cross-motion for summary judgment (ECF No. 12).

For the following reasons, the Court **RECOMMENDS** that Berry's motion for summary judgment (ECF No. 10) be **GRANTED**, that the Commissioner's motion for summary judgment (ECF No. 12) be **DENIED**, and that this case be

**REMANDED** to the ALJ for further proceedings consistent with this recommendation.

## I.   Background

### A. Procedural History

On March 21, 2019, Berry filed an application for a period of disability and disability insurance benefits under Title II and Part A of Title XVIII of the Social Security Act. (Tr. 295.[1]) In her application, Berry alleged that her disabling condition began on October 31, 2017. *Id*. On August 21, 2019, the Social Security Administration ("agency") denied Berry's claims for disability benefits and Supplemental Security Income ("supplemental") payments. (Tr. 178, 187.) Berry requested a hearing and appeared with counsel before Administrative Law Judge Colleen M. Mamelka (ALJ) on October 5, 2020. (Tr. 100.)

In the ALJ's October 26, 2020 decision, the ALJ found that Berry was not disabled for the purposes of the Social Security Act from October 31, 2017 through the date of the decision. (Tr. 77.) Berry sought to appeal the ALJ's decision. On September 10, 2021, the Appeals Council denied Berry's request for an appeal. (Tr. 6.) The Appeals Council's decision is the Commissioner's final decision. (Tr.

---

[1] The administrative record appears on the docket at ECF No. 8. All references to it are identified as "Tr."

1.) Berry now appeals that decision based on the ALJ's alleged failure to consider the whole record when determining Berry's disability. (ECF No. 10.)

## B.  The ALJ's Application of the Disability Framework

Under the Social Security Act, disability insurance benefits and supplemental payments are available only for those who have a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (citing 42 U.S.C. § 423(a), (d) and 20 C.F.R. § 416.920). The act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A) (nearly identical definition used in the supplemental payments context); 20 C.F.R. § 404.1505(a) (Aug. 24, 2012) (identical definition with added details promulgated by the agency).

The Commissioner determines whether a claimant is disabled through a five-step sequential analysis. 20 C.F.R. §§ 404.1520, 416.920 (Aug. 24, 2012) (identical five-step analysis for disability benefits and supplemental payments, respectively). First, if the claimant is engaged in significant gainful activity, no disability will be found. 20 C.F.R. § 404.1520(a)(4) (Aug. 24, 2012). Second, no disability will be found if the claimant does not have a severe impairment or

3

combination of severe impairments for a continuous period of at least 12 months. *Id.* Third, the Commissioner will determine that the claimant *is disabled* if the claimant's severe impairment meets or equals one of the impairments listed in the agency's regulations. *Id*. Fourth, if the claimant has the residual functional capacity (RFC) to perform any past relevant work, no disability will be found. *Id*. Fifth, even if the claimant is unable to perform their past relevant work, benefits are denied if the claimant can adjust to other work given the claimant's RFC, age, education, and work experience. *Id*. If the Commissioner "makes a dispositive finding at any point in the five-step process," the evaluation will not proceed to the next step. *Id*.

The claimant bears the burden of proof through step four, in which they must show "the existence and severity of limitations caused by [their] impairments and the fact that [they] are precluded from performing [their] past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987)); *accord* 20 C.F.R. §§ 404.1512(a)(1), 416.912(a)(1) (Mar. 27, 2017). At step five, determining whether the claimant can adjust to other work in the economy, the burden shifts to the Commissioner. *Jones*, 336 F.3d at 474; 20 C.F.R. §§ 404.1512(b)(3), 416.912(b)(3) (Mar. 27, 2017). That is, the Commissioner must show that "other jobs in significant numbers exist in the

4

national economy that [the claimant] could perform given [their] RFC and considering relevant vocational factors." *Jones*, 336 F.3d at 474.

Berry was 48 years old on the alleged disability onset date. (Tr. 87.) She has at least a high school education and has past relevant work as a (1) cashier, (2) deli worker, (3) automotive parts inspector, and (4) office assistant. (Tr. 322.)

The ALJ determined that Berry met the insured status requirement and was insured through June 30, 2020. (Tr. 78.) Next, the ALJ applied the five-step disability analysis and found at step one that Berry had not engaged in substantial gainful activity since the alleged onset date of October 31, 2017. (Tr. 78.) At step two, the ALJ found that Berry had the following severe impairments: (1) cervical and lumbar spine degenerative disc disease status-post laminectomy; (2) lumbar spine radiculopathy with stenosis and spondylolisthesis status-post fusion; (3) alcoholic hepatitis; (4) alcohol abuse; (5) depressive disorder; (6) anxiety disorder; (7) and post-traumatic stress disorder (PTSD). (Tr. 78–79.) Additionally, the ALJ found that Berry had the following non-severe impairments, which the ALJ considered in her analysis: (1) COPD/emphasema, (2) pansinusitis, (3) cannabis use, and (4) bursitis. (Tr. 79.) At step three, the ALJ found that Berry did not have an impairment or combination of impairments that met or medically equaled one of the listings in the regulations. (Tr. 79.) Next, the ALJ determined that Berry has the RFC to perform light work with certain limitations:

5

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she requires a sit/stand option at will, provided she is not off task more than 10% of the workday. She can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, crawl and overhead reach. There will be no ladders, ropes or scaffolds, unprotected height, dangerous moving machinery, and extreme cold or wetness. She is limited to simple, routine tasks performed in a work environment free of fast-paced production, involving occasional workplace changes and occasion interactional [sic] with the public.

(Tr. 80–81.) At step four, the ALJ found that Berry was unable to perform any past relevant work. (Tr. 86.) At step five, considering Berry's age, education, work experience, and RFC, the ALJ found that Berry could perform jobs that exist in significant numbers in the economy, including marker, Dictionary of Occupational Titles (DOT) 209.587-034, router, DOT 222.587-038, and collator, DOT 208.685-010. (Tr. 87.)

## II.   Discussion

### A. Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final administrative decision. The court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (citations and internal quotations omitted). Substantial

evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (citations omitted). The court should examine the whole record when reviewing the ALJ's decision, and not just the facts cited to in that decision. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001) (citations omitted). A finding of substantial evidence must be based on the whole record and must take evidence into account that fairly detracts from its weight. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (citations omitted).

### B. Analysis

The undersigned finds that the ALJ's decision to discount Berry's subjective complaints of pain was not supported by substantial evidence. The government attempts to support the ALJ's finding under the substantial evidence review with three arguments. First, it contends that one misread image is not enough to require remand. Second, notwithstanding the misinterpreted image of Berry's spine, the government argues that the ALJ's decision was supported by substantial evidence. (ECF No. 12.)  Further, the government strongly suggests that as a matter of law, RFC assessments are supported by substantial evidence when the ALJ finds greater limitations than a prior administrative medical finding. (*Id*. at PageID.2347–48.) None of these arguments is persuasive for the reasons that follow.

The ALJ's determination of Berry's credibility was against the weight of the available evidence and is not supported by the record; thus, the RFC and decision based on that determination is also not supported by substantial evidence.

"Limitations involving generalized pain 'may be severe enough to constitute disability.'" *Masters v. Comm'r of Soc. Sec.*, 707 Fed. Appx. 374, 379 (6th Cir. 2017) (citing *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984)). Specifically, generalized pain caused by a long history of severe and persistent back pain can result in disability. *See King*, 742 F.2d at 975.

When pain forms the basis of a disability claim, the ALJ must use a two-part analysis. *Wilson v. Comm'r of Soc. Sec.*, 783 Fed. Appx. 489, 502 (6th Cir. 2019). First, the ALJ determines "if there is an underlying medically determinable physical impairment that could reasonably be expected to produce" pain. *Id.* (citing 20 C.F.R. § 404.1529(a)). Second, if an impairment exists, the ALJ must "evaluat[e] the intensity, persistence, and limiting effects of the symptoms on the individual's ability to do basic work activities." *Id.* Some considerations for this analysis include "the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medication to alleviate pain or other symptoms; other types of treatments; other measures used to relieve pain or other

symptoms; and other factors concerning functional limitations or restrictions." *Id.* (citing 20 C.F.R. § 404.1529(c)(3)).

It is for the ALJ to evaluate the credibility of witnesses and deference should be given to the ALJ's choices. *Rogers*, 486 F.3d at 247. However, the credibility determinations must be supported by the evidence in the record and cannot be made on intuition alone. *Id.* Therefore, determinations of the claimant's credibility regarding pain are subject to the substantial evidence standard and must be reasonable. *Wilson*, 783 Fed. Appx. at 502. Given the nature of spine disorders that compromise nerve roots or the spinal cord, "where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." *See Rogers*, 486 F.3d at 248 (citing *Hurst v. Sec'y of Health & Hum. Servs.*, 753 F.2d 517, 519 (6th Cir. 1985)). That is, explanations as to the claimant's credibility which are inconsistent with the entire record and against the weight of the relevant evidence "will not pass muster". *Id.* The Court must examine the evidence in the record that fairly detracts from the ALJ's decision when determining if the decision was supported by substantial evidence. *Abbott*, 905 F.2d at 923. Further, explanations as to the claimant's credibility which are inconsistent with the entire record cannot be supported by substantial evidence. *Rogers*, 486 F.3d at 248.

### a. Medical history of back pain

Berry has a long and well documented history of pain caused by lower back musculoskeletal pathologies. Her history of treatment, improvements, and declines in her condition are important to determining Berry's credibility. On July 17, 2008, Berry was discharged from the emergency room with a diagnosis of back pain of unknown origin and sciatica. (Tr. 1623.) She had trouble walking, bony tenderness, spasms, and an abnormal straight leg raise test. *Id.* She was given a methylprednisolone injection and prescribed prednisone and Darvocet, for pain. *Id.* at 1623–24. Her lumbosacral spine image showed mild disc space narrowing at L1–L2 and L2–L3, but no issues at L4–L5 or L5–S1. (Tr. 1627.) She returned to the hospital for back pain at least five times between July 17, 2008 and November 4, 2014, the date of her first spine surgery. (Tr. 1628, 1631, 1640, 1680, 1692, 1811.) She was diagnosed with sciatica, painful lumbar radiculitis, lumbosacral radiculitis, spasticity, and lumbosacral strain. (Tr. 1629, 1633, 1642, 1695.) She had multiple images taken in that time, with progression noted between images, showing bilateral foraminal disc bulge, an annular tear, moderate facet osteoarthritis, mild bilateral lateral recess stenosis, and mild right and left neural foraminal narrowing at the L4–L5 level. (Tr. 1636–39, 1690–91, 1801–1804.)  The images also showed mild to moderate bilateral facet osteoarthritis, severe left

lateral recess stenosis impinging on the transiting left S1 nerve, and moderate to severe bilateral neural foraminal narrowing at the L5–S1 level. (Tr. 1804.)

Berry's treatment from 2008 to the end of 2014 included injections of methylprednisolone, dexamethasone, diazepam, hydromorphone, and ketorolac and prescriptions of the pain medications Darvocet, Flexeril, Vicodin, ibuprofen, methocarbamol, and meloxicam. (Tr. 1623–24, 1629–30, 1633, 1642, 1682, 1695–96.) Additionally, she received at least five transforaminal epidural steroid injection starting in January 2012. (Tr. 1646, 1664, 1711, 1730, 1758.) She also attended physical therapy from July 10, 2014 to September 4, 2014. (Tr. 1791–93.)

On November 4, 2014, Berry had surgery to alleviate her severe lower back pain:

> Laminotomies were performed on the left side at L5–S1 and L4–L5. Microdiscectomy was performed at L5–S1. Foraminotomy was performed at L5–S1. L4–L5 laminotomy, foraminotomy and far lateral microdiskectormy [sic] were performed at the Level of L5–S1. . . The patient tolerated the procedure extremely well and there were no complications.

(Tr. 1811–12.) After Berry's 2014 surgery, there is a gap in the record regarding her back pain until August 1, 2017 when she had a follow-up appointment regarding her back pain and insomnia. (Tr. 427.) She exhibited paravertebral muscle spasm and a positive straight leg test on her left leg to 30 degrees. (Tr. 430.) Neurontin was helping and her prescription was refilled; methocarbamol was also prescribed. (Tr. 428.) From August 1, 2017 to January 10, 2019, the date

11

Berry had an L4–S1 transforaminal lumbar interbody fusion surgery, she was treated for back pain. (Tr. 1052.) Her physical exams before her surgery showed decreased range of motion, tenderness, bony tenderness, pain in her lumbar back, and positive straight leg raise tests. (Tr. 427, 491.) Her treatment consisted of NSAIDs, Tylenol, Neurontin, heat and ice, ketorolac injections, and she was referred to a pain clinic. (Tr. 491, 501. 1113.) Her images showed "advanced degeneration of L5–S1 disc space with facet hypertrophy bilaterterally [sic] that is resulting in severe foraminal stenosis at L5–S1. There are similar changes at L4–5 with moderate foraminal stenosis bilaterally." (Tr. 1154.) Her neurosurgeon, Dr. Basheer, diagnosed her with lumbar radiculopathy and suggested epidural steroidal injections or surgery. *Id*. Berry elected surgery.

On January 10, 2019, Dr. Basheer performed surgery on Berry's spine. (Tr. 1052.) Dr. Basheer performed "full laminectomies at L4, L5 and S1 on both sides with medial facetectomy . . . Foraminotomies were done to alleviate the compression on the L4, L5, and S1 nerve roots bilaterally." (Tr. 1053.) These procedures decompress the nerve roots by removing portions of the vertebrae. Elan D. Louis, et al., Merritt's Neurology CH110 (13th ed. 2015), Westlaw LWWNEURO13TH CH110; Stedmans Medical Dictionary, Westlaw Stedmans Medical Dictionary 346950; Westlaw Stedmans Medical Dictionary 478850. Dr. Basheer also performed a fusion from L4 to S1. (Tr. 1053–54.) A fusion joins two

12

or more vertebrae together to stabilize an unstable spine. Oxford University Press,
Concise Medical Dictionary (Jonathan Law & Elizabeth Martin eds., 10th ed.
2020),
https://www.oxfordreference.com/view/10.1093/acref/9780198836612.001.0001/a
cref-9780198836612-e-3851.

At her two-week follow-up on January 25, 2019, PA David Vera noted that
her pain was well controlled with "PO APAP" (oral acetaminophen) and
methocarbomol, but Berry requested another non-narcotic pain medication, as she
could not use narcotics while undergoing addiction treatment. (Tr. 1048.)
Cymbalta was prescribed. (*Id*.) At her one-month follow up, Berry reported leg
pain that was uncontrolled by her medication. (Tr. 1047.) Dr. Basheer confirmed
stable hardware and placement with no sign of pseudoarthrosis. (Tr. 1047.) To treat
Berry's pain, Dr. Basheer referred her to physical therapy and wrote her a
prescription for Lyrica. *Id.* Her images from that visit indicated no significant disc
narrowing and no obvious spondylolysis or spondylolisthesis. (Tr. 2199–2200.)

Berry returned to the neurosurgery clinic on April 29, 2019. (Tr. 1924.) She
indicated increased pain in her low back, buttocks, and hips, exacerbated by
increased work activity. *Id*. Dr. Basheer diagnosed her with residual inflammation
and prescribed her Norco. (Tr. 1924.) Her images from this visit showed:

13

[M]oderate posterior disc narrowing at L1–L2 with mild degenerative posterior subluxation of L1 in relation to L2 . . . mild posterior disc narrowing at L3–L4 . . . posterior fusion of L4–S1 . . . vertebral body heights are preserved. Lumbar discs are not significantly narrowed. There is no obvious spondylolysis or spondylolisthesis. (Tr. 2201.)

On May 18, 2019, Berry checked into the emergency room complaining of back pain. (Tr. 1926.) She exhibited lumbar muscle tenderness, but no signs of focal neurological deficits, with lower extremity sensation intact, and dorsiflexion and plantarflexion were 5/5 bilaterally. (Tr. 1929.) Her image from that visit showed no evidence of hardware fracture, perihardware lucency or subsidence around the devices. (Tr. 2202.) There was mild disc space narrowing at L3–L4, multilevel facet arthropathy, multilevel disc degeneration and spondylitic changes involving the visualized lower thoracic spine. *Id.* She was diagnosed with acute low back pain with and without sciatica and prescribed orphenadrine for muscle spasms. (Tr. 1930.)

On July 30, 2019, she had a follow up with Dr. Picard for her low back pain. (Tr. 1946.) Berry stated her pain occurred daily and described it as "mild" and rated it as a "4/10". *Id*. Dr. Picard prescribed orphenadrine and Lyrica. (Tr. 1948.)

One year after Berry's L4–S1 lumbar fusion surgery, on January 21, 2020, she returned to the neurosurgery clinic. (Tr. 1962.) She reported increasing pain uncontrolled by taking Lyrica. *Id.* Berry received a ketorolac injection for the pain and was offered methylprednisolone a week later. (Tr. 1965.) The CT scan taken

14

on January 10, 2020 redemonstrated hardware spanning L4–S1, showed grade 1

anterolisthesis of L4 on L5, and exhibited mild multilevel disc space narrowing

and facet degenerative change at the additional lumbar vertebral levels. (Tr. 2204.)

A second CT scan was performed on January 31, 2020, demonstrating:

> L2–L3: Broad-based disc bulge, ligamentum flavum thickening and
> facet hypertrophy result in mild central canal stenosis. Mild bilateral
> neural foraminal narrowing. 1.6 mm of retrolisthesis of L2 upon L3.
> L3–L4: Broad-based disc bulge, ligament flavum thickening and facet
> hypertrophy result [sic] in mild to moderate central canal stenosis.
> Moderate bilateral neural foraminal narrowing. 1.8 mm of retrolistesis
> of L3 upon L4.
> L4–L5: Disc prosthesis. Left hemilaminotomy defect . . . Mild to
> moderate right neural foraminal narrowing . . . There is partial resection
> of left facet.
> L5–S1: Disc prosthesis. Left hemilaminotomy defect . . . There appears
> to be abnormal hypoattenuation along the left aspect of the central
> spinal canal. Questionable narrowing of the thecal sac. Moderate right
> foraminal narrowing . . . There is partial resection of the lest facet. (Tr.
> 2206.)

On March 10, 2020, Berry was seen at the Jackson Pain Clinic for her back

pain. (Tr. 1819.) Her physical showed normal range of motion in her lumbar spine

that was active with pain, no tenderness, no spasm and normal gait. (Tr. 1823.) She

had a positive straight leg test on her left leg, positive facet loading test bilaterally,

positive Faber's test to the left, positive Genslen's test to the left, and a positive

compression test to the left. *Id*. During Berry's March 10, 2020 visit, CNP Horgan

charted the following:

> CT [taken on January 31, 2020] reviewed with shows right NF
> narrowing at L4/5 and L5–S1 with central canal hypoattenuation in the

central canal that would be best evaluated with MRI, this is ordered however patient states she is unable to get this d/t insurance issue. Exam reveals positive facet screen as well as positive provocative testing of the left SI joints with fabers, compression and gaenslen's all positive to the left.

(Tr. 1825.) CNP Horgan suggested that Berry receive a "[l]eft SI joint injection," continue a home exercise program to strengthen her core and range of motion, to follow up with the pain clinic for continued evaluation, and to ask her PCP to increase her Lyrica dose. (Tr. 1825.) CNP Horgan further recommended that Berry follow up with a neurosurgeon to have an MRI done in order to better evaluate the developing issues in her lumbar spine. (*Id.*)

On March 13, 2020, Berry visited PA Kimble for her back pain. (Tr. 1966.) On her physical, Berry exhibited decreased range of motion, tenderness, bony tenderness, and pain. (Tr. 1968.) PA Kimble increased her Lyrica dose and suggested a follow-up with the neurosurgeon and pain specialist as scheduled. *Id*. PA Kimble also counseled Berry on weight management and physical activity. *Id*.

### b. Substantial evidence review

The ALJ found that "the medical evidence does show that [Berry] has physical and mental impairments that would reasonably result in some limitations. However, the evidence suggests that her functioning is not as limiting as alleged." (Tr. 81.) The ALJ determined that Berry's impairments could cause her reported limitations; thus, the issue is whether substantial evidence supports the ALJ

16

discounting Berry's statements about the intensity, persistence, and limiting effect of her symptoms. *See Wilson*, 783 Fed. Appx. at 489. There is enough evidence in the record that supports Berry's statements concerning the intensity of her pain to severely undercut the ALJ's conclusions regarding Berry's credibility. This evidence is enough to render the ALJ's discounting of Berry's statements unsupported by substantial evidence. Therefore, the ALJ's RFC analysis based on those conclusions was flawed, and the ultimate decision is not supported by substantial evidence.

First, the ALJ relied on evidence of an improved condition after Berry's surgeries and on the latest images of Berry's spine to discount Berry's statements. *See* (Tr. 81–85.) The evidence provided of Berry's condition at the time of the hearing, including her most recent images, do not support the ALJ's decision to discount Berry's statements. The record shows that Berry's improvements after her surgeries were transitory and her condition has deteriorated again. This corroborates Berry's testimony that "it's recently gotten much worse." (Tr. 114.)

It is error to discount the claimant's testimony based on evidence of "periodic improvements and cessation of treatment" when the evidence on the record shows a continuing illness despite increasingly serious treatments. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014). In *Gentry*, the claimant had the chronic conditions of psoriasis and psoriatic arthritis. *Id*. There were

17

instances in the record of improved condition. *Id*. However, the impairment was never resolved, and each period of improvement was followed by one of decline. *Id*. The court found that it was error to discount the claimant's statements based on periodic improvements. *Id*. at 725. Berry's medical record exhibits similar cycles. Her condition worsens, and in response, her providers use increasingly severe interventions to treat it. Berry's symptoms will respond to treatment for a time, but will eventually decline again.

Berry's latest diagnosis from the Jackson Pain Clinic was "[l]umbar radiculopathy," the same diagnosis she received before her L4–S1 fusion surgery. (Tr. 1111, 1824.) Compared to the images taken right before and after her surgery, her most recent images show a progressing and declining condition. Before her latest surgery, on July 27, 2018, Berry had a lumbar spine MRI taken, showing:

> L4–L5:. . . overall moderate stenosis of the central canal, moderate to severe stenosis of the bilateral lateral recesses, and severe bilateral neural foraminal stenosis . . .
> L5–S1: Moderate to severe disc degeneration with height loss . . . disc bulge associated with a small posterior annular tear . . . mild central stenosis however there is moderate left subarticular recess stenosis with disc material coming in close contact to the descending left S1 nerve root.

On February 25, 2019, a month after Berry's surgery, her images showed "Lumbar discs are not significantly narrowed. There is no obvious spondylolysis or spondylolisthesis." (Tr. 2199–2200.) And her most recent image from January 31, 2020 shows "L4–L5: . . . Mild to moderate right neural foraminal narrowing . . .

18

L5–S1: . . . Questionable narrowing of the thecal sac. Moderate right foraminal narrowing." (Tr. 2206.) Additionally, Berry has also started developing problems in her L2–L3 and L3–L4 disc space. This was first noted on an April 29, 2019 image that showed "mild posterior disc narrowing at L3–L4." (Tr. 2201.) Disc narrowing can cause spinal stenosis and can result in pain and other neurological symptoms. Elan D. Louis, et al., Merritt's Neurology CH110 (13th ed. 2015), Westlaw LWWNEURO13TH CH110.  This issue reappeared and progressed in her latest image from January 31, 2020:

> L2–L3: Broad-based disc bulge, ligamentum flavum thickening and facet hypertrophy result in mild canal stenosis. Mild bilateral neural foraminal narrowing. 1.6 mm of retrolisthesis of L2 upon L3
> L3–L4: Broad-based disc bulge, ligament flavum thickening and facet hypertrophy result in mild to moderate central canal stenosis. Moderate bilateral neural foraminal narrowing. 1.8 mm of retrolisthesis of L3 upon L4.

(Tr. 2206.) While the record shows that the fusion surgery likely provided some temporary relief to the symptoms caused by Berry's L4–S1 disc space conditions, the recent progression shown on her images credits Berry's statements of a worsening condition. As of the date of the hearing before the ALJ, she began to exhibit moderate foraminal narrowing at the L4–L5 and L5–S1 levels that were progressing. The most recent images are similar in severity to the images taken right before her surgery. Additionally, her recent images show that the L2–L3 and L3–L4 levels appeared to be even worse than her L4–L5 and L5–S1 levels.

19

Therefore, the evidence of from the most recent images and medical diagnoses are inconsistent with the ALJ's characterization of Berry's "cervical and lumbar spine issues" as having "improved with surgical intervention". (Tr. 85.)

Second, the ALJ states that Berry's strength, gait, reflexes, and normal range of motion during her physical exams indicate that Berry's symptoms are not as limiting as claimed. (*See* Tr. 81–85.) However, some of Berry's physical exams show issues with range of motion, including her most recent visit for back pain on March 13, 2020. (Tr. 1823, 1968.) Additionally, at her March 10, 2020 visit to the pain clinic, she was positive for many of the tests used to determine musculoskeletal issues and nerve irritation, including a straight leg test, facet loading test, Faber's test, Gaenslen's test, and compression test. (Tr. 1823.)

While objective medical evidence of strength, gait, and reflexes are used to determine if the musculoskeletal disorder falls within Listing 1.04, it is not required for a finding of disability based on the claimant's RFC. *See* 20 C.F.R. pt. 404, subpt. P, app. 1, 1.04 (May 21, 2020) (requiring motor loss; sensory or reflex loss; or an extreme limitation on the ability to walk to meet the criteria of Listing 1.04); *see also Sullivan v. Zebly*, 493 U.S. 521, 532 (1990) ("The Secretary explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard"). Rather, all objective medical evidence, including evidence of strength, gait, and reflexes, is "a useful indicator"

20

to assist the agency in evaluating the intensity and persistence of symptoms. 20

C.F.R. § 404.1529(c)(2). However, the ALJ cannot discount statements about the

intensity and persistence of pain solely because the objective evidence does not

substantiate Berry's statements. *See Gentry*, 741 F.3d at 726; 20 C.F.R. §

404.1529(c)(2) (Mar. 27, 2017). The ALJ improperly relied on these tests as a

basis for discounting Berry's statements.

Further, the evidence of Berry's recent positive provocative test for

musculoskeletal abnormalities and decreased range of motion strongly cut against

the ALJ's finding that Berry's symptoms are not as limiting as Berry claimed. This

is especially true given that, as stated above, Berry's medical history shows a

cyclic nature to her condition of improvements and declines. The ALJ appears to

have relied on the portions of the record where Berry's tests were normal and

discounted the more recent tests, which were not. This was in error. *See Gentry*,

741 F.3d at 725.

Third, the ALJ purports to discount Berry's claims about the intensity and

limiting effects of her pain based on her provider's conservative treatment. *See* (Tr.

81–85.) History of treatments, medications, and other methods for controlling pain

are to be considered when determining the claimant's credibility concerning pain.

20 C.F.R. § 404.1529(c)(3) (Mar. 27, 2017). However, Berry has already

undergone two surgeries for her spinal afflictions. Additionally, Berry's treatment

history after her most recent surgery does not support the ALJ's decision to undermine Berry's credibility.

Berry reported increasing pain uncontrolled by Lyrica when she returned to the neurosurgery clinic on January 21, 2020. (Tr. 1962.) She was given a ketorolac injection and was offered methylprednisolone, a steroid. (Tr. 1965.) She was referred to the Jackson Pain Clinic and a "left SI joint injection" was prescribed. (Tr. 1825.) Additionally, Berry's provider recommended that her primary care physician (PCP) increase Berry's Lyrica dose, that Berry schedule an MRI for better evaluation of the problem, and that she follow up with the pain clinic for continued evaluation. *Id*. After her fusion surgery, at various points, Berry received prescriptions of Lyrica, Norco, orphenadrine, and methylprednisolone for untreated back and leg pain by different providers. (Tr. 1047, 1825, 1924, 1948, 1965.) Additionally, Berry received a ketorolac injection and CNP Horgan ordered an SI joint injection. (Tr. 1825, 1965.) Berry's visits for pain were increasing in frequency as was the intensity of the treatments. Additionally, many of the prescribed treatments were losing effectiveness. (Tr. 1962–65.) (pain increasing in intensity and unmanaged by rest or Lyrica alone). The treatments used at the time of the hearing were similar to the ones that Berry received right before her two surgeries. (*Id*.) The record of Berry's treatment after her most recent surgery corroborates Berry's statements that her back pain improved after her surgery but

22

has steadily worsened. Further, Berry has already had *two* invasive surgeries on her spine to attempt to resolve the issue, both of which have had limited success based on the record. The undersigned cannot reconcile such treatments with the ALJ's view that Berry has received conservative treatment. Regardless, Berry does not need to have already scheduled another surgery for her statements to be credible. Invasive surgery is a last resort, as exhibited by Berry's record. The evidence of increasing severity of treatment corroborates Berry's statements that the condition has worsened after her symptoms improved from the most recent surgery. Therefore, the ALJ's conclusions based on Berry's treatment history are inconsistent with the entire record, particularly the most recent evidence. *See Rogers*, 486 F.3d at 248; *Gentry*, 741 F.3d at 725.

Finally, the ALJ discounted Berry's statements about the intensity of pain because "she does perform personal care tasks, prepares simple meals, performs light household chores, and shops in stores." The ALJ is also free to consider Berry's daily activities in determining her credibility around pain. 20 C.F.R. § 404.1529(c)(3) (Mar. 27, 2017). But performing minimal daily functions cannot support an ALJ's decision to discount subjective claims of pain. *Rogers*, 486 F.3d at 248; *Kalmbach v. Comm'r of Soc. Sec.*, 409 Fed. Appx. 852, 864 (6th Cir. 2011).

23

In *Rogers*, the claimant suffered from fibromyalgia and rheumatoid arthritis. 486 F.3d at 248. The ALJ partly discounted the claimant's subjective statements of pain because the claimant was able to "drive, clean her apartment, care for two dogs, do laundry, read, do stretching exercises, and watch the news." *Id*. This was error for two reasons. First, it was a mischaracterization of the claimant's abilities and it failed to mention the claimant's reliance on others for help. *Id*. at 248–249. Second, even if properly characterized, those minimal daily functions were not comparable to typical work activities. *Id.* at 249. The RFC is an analysis to determine a person's ability to perform in a work setting. 20 C.F.R. §§ 404.1545, 416.945. As the *Rogers* court pointed out, one can do minimal daily activities and still be unable to perform on the job. *See* 486 F.3d at 248.

Berry stated that for "15 minutes I can do something, then I have to sit down and then – and get back up." (Tr. 119.) As for shopping, she stated, "I can shop by myself . . . I need to have the carts. I need to hang onto the carts just because, you know, I am walking for a distance when I grocery shop. A lot of times, I do have, you know, friends go for me." *Id*. Berry also requires a back brace to walk. *Id.* When asked about her personal care, Berry responded, "[s]howering is kind of difficult for me. Shaving my legs is pretty much out of the question." (Tr. 120.) Here, the ALJ did not mischaracterize Berry's functioning; however, the ALJ did fail to mention that Berry requires assistance from medical devices, props, and

24

friends for the more physical tasks cited. (Tr. 85.) A finding discrediting Berry's subjective statements regarding pain based on her statements about limited daily functioning with support from friends and medical devices is unsupported by substantial evidence. *See Rogers*, 486 F.3d at 248–49 (explanations for accepting or rejecting claimant's credibility should be consistent with the entire record).

Cases that do find substantial evidence support based on the claimants' daily functioning also support Berry. In *Amir v. Comm'r of Soc. Sec.*, there was contradictory testimony in the record about the claimant's level of functioning. 705 Fed. Appx. 443, 448 (6th Cir. 2017). Some of the claimant's own statements suggested that the claimant exercised, raised his six children, cooked meals as a hobby, and straightened the garage. *Id*. These activities require more physical exertion similar to what one might encounter at work. Contradictory testimony in the record regarding the level of daily functioning was enough to undermine the claimant's testimony. *See id.* at 450–51. Further, there were other indicators that the claimant's testimony was not credible. There were notes in the medical record of "overreaction". *Id*. None of these factors is present in Berry's case. She has only ever testified to minimal functioning and stated she requires help from friends. There is no contradictory testimony in the record to rebut her statements, and none of her doctors have implied that her credibility is an issue.

Further, in another case, *Oliver v. Comm'r of Soc. Sec.*, the claimant testified to performing labor intensive tasks like raking and other semi-skilled and unskilled work. 415 Fed. Appx. 681, 685–86 (6th Cir. 2011). Further, the claimant admitted to only using over the counter pain medications for pain management, despite having stronger medications on hand. *Id*. Finally, the claimant's own doctors questioned the claimant's credibility. *Id*. Again, none of those factors is present in Berry's case. This case is more akin to *Rogers* than *Amir* or *Oliver*.

The ALJ's decision to discredit Berry's statements about the intensity and limiting effects of her pain was not supported by substantial evidence. Berry's statements were corroborated by her images, her positive tests for musculoskeletal pathologies and nerve root irritations, evidence of worsening condition post-surgery, and her testimony of her daily functioning. The ALJ's conclusions drawn from this evidence are inconsistent with entire record and are against the weight of the evidence. *See Rogers*, 486 F.3d at 248–49.

The government has made three arguments in support of the agency's determination. The government's first argument strongly suggests that this case should be decided as a matter of law because the ALJ found greater limitations than the state agency consultant. This argument is unavailing for three reasons. As an initial matter, the Court does not find that the RFC finding is *necessarily* flawed, but rather that the decision to discredit Berry's testimony is. That makes

26

the reasoning behind the RFC finding flawed, rendering the RFC unsupported by substantial evidence. The harmless error doctrine only applies to credibility determinations when the ALJ's decision to discount the claimant's statements is supported by substantial evidence in spite of any minor error made during the determination. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). As the ALJ's decision here is unsupported by substantial evidence, this error requires remand.

The second issue with the argument is that the state agency determinations were filed more than a year before the ALJ proceedings and occurred less than a year after Berry's second surgery. The state agency filed its disability determinations on August 21, 2019. (Tr. 152–53, 167.) Berry had undergone her second surgery on January 10, 2019, just eight months before the state agency's determinations. It is uncontested that Berry's condition improved immediately after the surgery notwithstanding some residual pain caused by the surgery itself. Berry did not start to complain of uncontrolled back pain again until May 19, 2019, when she checked herself into the emergency room, mere months before the state agency's determination. The state agency's determination was based on old information. The ALJ held a hearing on October 5, 2020 and issued a decision on October 26, 2020, more than a year after the state agency issued its findings. (Tr. 73, 100.) Given that much of the evidence that cuts against the ALJ's findings was

27

recorded after the state agency's determination, it seems inappropriate for the whole case to turn on the outcome of those initial determinations. Further, the agency's own regulations regard this evidence as neither inherently valuable or persuasive. 20 C.F.R. § 404.1520b(c)(3)(v). This is because a determination of a claimant's capacity to perform work is not a medical opinion, but a legal conclusion reserved for the Commissioner. *Amir*, 705 Fed. Appx. at 448. As such, the agency does not typically provide any analysis on how it considered evidence from its state level counterparts. *Id*. The government is correct that the ALJ can look to the underlying evidence to determine the persuasiveness of the opinions in those determinations. 20 C.F.R. § 404.1520c. However, the ALJ's conclusory statements that the state agency level opinions are consistent with the subsequently produced evidence is unsupported by substantial evidence. The record clearly shows a worsening condition since those evaluations. (*See, e.g.,* Tr. 1962) (increasing pain that was no longer managed by rest or taking Lyrica). The ALJ's decision must stand on its own with the relevant evidence in the whole record, especially with the addition of new evidence of a progressing condition. *See Rogers*, 486 F.3d at 248–49.

The third and final issue with the government's argument is that the Court has an obligation to review the entire record and determine if the ALJ's decision is supported by the law and by substantial evidence. 42 U.S.C. § 405(g); *Longsworth*,

402 F.3d at 595. Allowing an ALJ's determination to stand based solely on the

decision to add more restrictions is not a review of the determination based on

substantial evidence. The Social Security Administration's own rules require more

than that from the ALJ. *See* 20 C.F.R. §§ 404.1520b(c)(3)(v), 404.1520c (stating

that the medical opinions and findings of the state agency are not inherently

valuable and that the ALJ must substantiate the opinions and findings based on the

evidence in the record).

The government cites to an unpublished case from this district alluding to

this proposition. *Paquette v. Saul*, No. 19-12006, 2020 WL 6391311, at *4 (E.D.

Mich. July 29, 2020) (citing cases), *R&R adopted*, 2020 WL 5761059 (E.D. Mich.

Sept. 28, 2020). But the holding of that case does not go nearly that far. In

*Paquette*, the court merely noted that courts in this district are more likely to find

that an ALJ's decision is supported by substantial evidence if the RFC finding is

more restrictive than the state agency's opinion. *Id*. The undersigned agrees with

the suggestion that when the ALJ's decision agrees with and goes further than the

state agency, it is more likely to be supported by substantial evidence. But where

the two decisions take place more than a year apart and the evidence in the record

shows a marked progression in the claimant's condition in that span, adding further

restrictions will not save an opinion unsupported by substantial evidence. *See*

29

*Rogers*, 486 F.3d at 248–49 (the ALJ's decision must be supported by the evidence in the record).

The second argument the government makes is that a single misread image is not enough to establish functional limitations. (ECF No. 12, PageID.2350.) The Court will not address this argument or the unpublished cases the government cites to as the above analysis is based on the ALJ's decision being unsupported by the entire record and not just one misread image. The government is correct that the "ALJ can consider all the evidence without directly addressing . . . every piece of evidence submitted by a party." *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006). However, when the ALJ's decision is unsupported by *the weight of the entire record*, as the Court finds here, the decision cannot stand. *See Rogers*, 486 F.3d at 248.

Finally, the government argues that Berry must make specific suggestions of further restrictions that may be necessary to accommodate her condition. (ECF No. 12, PageID.2354.) However, the Court is recommending remand because the ALJ's flawed decision to discount Berry's subjective statements makes the RFC analysis that relies on those discounted statement unsupported by substantial evidence. It is not for the court to determine whether a greater or lesser RFC is required, only whether the ALJ's decision is supported by substantial evidence. *See Longsworth*, 402 F.3d at 595; *see also Ulman* 693 F.3d at 714 (stating that the

30

harmless error doctrine only applies to credibility determinations when the evidence still substantially supports the credibility finding).

Since the ALJ's decision to discredit Berry's statements regarding Berry's pain was unsupported by substantial evidence, the RFC analysis based on that decision that followed proceeded in error.

## III.   Recommendation

For the preceding reasons, the Court **RECOMMENDS** that Berry's motion for summary judgment (ECF No. 10) be **GRANTED**, that the Commissioner's motion for summary judgment (ECF No. 12) be **DENIED**, and that this case be **REMANDED** to the ALJ for further proceedings consistent with this recommendation.


Dated:   February 6, 2022          s/**Jonathan J.C. Grey**
                                   Jonathan J.C. Grey
                                   United States Magistrate Judge

## Notice to the Parties About Objections

Within 14 days of being served with a copy of this Report and Recommendation, any party may object to and seek review of the proposed findings and recommendations set forth above. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). If a party fails to timely file specific objections, any further right of appeal is waived. *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Only specific objections to this Report and Recommendation are preserved for appeal; all other objections are waived. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). Each objection must be labeled as "Objection No. 1," "Objection No. 2," etc. Each objection must specify precisely the provision of this Report and Recommendation to which it pertains. In accordance with Local Rule 72.1(d), copies of objections must be served on this Magistrate Judge.

A party may respond to another party's objections within 14 days after service of any objections. Fed. R. Civ. P. 72(b)(2). Any such response should be concise and address each issue raised in the objections in the same order and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## Certificate of Service

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on February 6, 2022.

<u>s/ **K. Grimes**</u>
Kim Grimes
Case Manager

33